# IN THE SUPREME COURT OF TEXAS

No. 20-0066

HAYNES AND BOONE, LLP AND ARTHUR L. HOWARD, PETITIONERS,

v.

NFTD, LLC F/K/A BERNARDO GROUP, LLC, BERNARDO HOLDINGS, LLC, PETER J. COOPER, AND JACQUELINE MILLER, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

**Argued March 23, 2021**

JUSTICE BOYD delivered the opinion of the Court.

JUSTICE HUDDLE did not participate in the decision.

In a series of cases over the last several years, including another case we decide today,[1] we have been called upon to define more precisely the scope of the attorney-immunity defense. Because each of those cases complained of an attorney's litigation-related conduct, we did not decide whether the defense applies to claims based on an attorney's conduct outside of litigation, such as conduct in connection with a business transaction. This case requires us to decide that issue. We hold that attorney immunity applies in all adversarial contexts in which an attorney has a duty to zealously and loyally represent a client, including a business-transactional context, but only when the claim against the attorney is based on the "kind" of conduct attorney immunity

---

[1] *See Landry's, Inc. v. Animal Legal Def. Fund*, — S.W.3d — (19-0036) (May 21, 2021).

protects. Because the court of appeals held otherwise, we reverse and remand the case to that court for it to address additional issues it did not reach.

**I.**
**Background**

By at least one account,[2] anyone who appreciates a classy pair of women's sandals has Italian architect Bernard Rudofsky to thank. After "inventing" the modern-day sandal and founding the Bernardo company in the 1940s, Rudofsky went on to produce "the most talked-about shoes of their day."[3] By the 1960s, Bernardo sandals were reportedly everywhere, from the pages of Vogue Magazine and Harper's Bazaar to the feet of Jackie Kennedy.[4] But after the 1970s, the Bernardo brand began a slow and steady decline.

In 2001, Roy Smith, Jr., his wife Wilma "Jean" Smith, and designer Dennis Comeau purchased the Bernardo brand assets through a company they created called TEFKAB Footwear, LLC. Unfortunately, Roy Jr. died the following year, leaving his interest in the company to his adult children, Cynthia Smith and Roy R. "Trae" Smith, III. Trae took over as TEFKAB's manager, and by the mid-2000s, Bernardo sandals were back—back in the Neiman Marcus catalog, back in over 800 stores around the world, and back on the feet of the rich and famous, such as Halle Berry, Reese Witherspoon, and Beyoncé.[5]

---

[2] *See* BERNARDO 1946, *About*, https://bernardo1946.com/pages/new-about (last visited May 12, 2021).

[3] Clifford Pugh, *Bernardo shoes make a comeback*, HOUS. CHRON. (Aug. 26, 2007), https://www.chron.com/life/article/Bernardo-shoes-make-a-comeback-1641468.php.

[4] *Id.*; *see also* Troy Patterson, *The Essay to Read if You Even Think About Wearing Clothes*, THE NEW YORKER (July 11, 2019), https://www.newyorker.com/culture/cultural-comment/the-essay-to-read-if-you-even-think-about-wearing-clothes; Carol Kino, *Are Clothes Modern?*, The N.Y. TIMES (Feb. 24, 2008), https://archive.nytimes.com/query nytimes.com/gst/fullpage-9F00E7D91E39F937A15751C0A96E9C8B63 html ("Jackie Kennedy was said to own 16 colors of the same pair.").

[5] Pugh, *supra* note 3.

Under Trae's leadership, TEFKAB sued a number of competitors for infringing on Bernardo's patents, including five patents at issue in the underlying litigation here.[6] During that litigation, however, the company concluded that its patents were invalid because Bernardo's patent attorneys had missed the filing deadlines. TEFKAB dismissed the patent suits and instead sued its patent attorneys in a Maryland state court, alleging that the attorneys' malpractice rendered the patents "unenforceable" and "worthless." TEFKAB never notified the United States Patent and Trademark Office that the patents were invalid.

By 2008, Trae's co-owners had lost confidence in his leadership. In 2009, they hired attorney Arthur "Arty" Howard, then a partner at Haynes and Boone, to handle the process of removing Trae from his position as TEFKAB's manager. Acting as TEFKAB's attorney, Howard terminated Trae. That same day, the company announced that it had hired Howard and his firm to represent the company in all of its "business, financial and legal matters."

Over the next several months, Howard and others at Haynes and Boone billed a lot of hours to the company, and TEFKAB quickly fell behind on paying their invoices. Around this time, Howard conducted an internal investigation and produced a lengthy report addressing Trae's management and other areas of concern. Through the investigation and through other sources, Howard learned that TEFKAB had sued the Maryland patent lawyers for malpractice. He claims he never "read any pleadings in that case," "[h]ad no understanding" about the lawsuit, and "had no knowledge of [the patents] being worthless or unenforceable or invalid." Other evidence, however, seems to clearly contradict these assertions.

---

[6] The patents were for five Bernardo sandals: the Milly (patent no. D495,855), Mistral (D496,147), Matrix (D508,305), Miami (D487,183), and Miami Woven (D489,517).

In 2010, TEFKAB's owners decided to sell the Bernardo brand assets and commissioned Howard to handle the sale. To assist with the sale, Howard prepared a "Confidential Business Profile," describing the company and its assets. The profile asserted that TEFKAB consistently developed, protected, and defended its intellectual property and that its patents bore "significant" value. It specifically listed the five patents now at issue, without mentioning the Maryland lawsuit or any concerns that those patents were invalid or "worthless."

Cynthia Smith mentioned TEFKAB's interest in selling the Bernardo brand assets to her old college friend, Peter J. Cooper. Cooper and his business partner, Todd Miller, were interested in buying the assets, and they formed four companies—NFTD, LLC, Bernardo Group, LLC, Bernardo Holdings, LLC, and Cooper Miller, LLC (collectively, NFTD)—to make the purchase. Like Cynthia and Cooper, Howard and Miller had a prior relationship and were friends. Miller and Cooper now assert that, throughout the ensuing negotiation process, Howard made several misrepresentations to them regarding the Bernardo brand assets and regarding other interested buyers. They also assert that Howard took advantage of his friendship with Miller and improperly tried to convince them to hire Howard once NFTD purchased the assets, even though he was then still representing TEFKAB.

NFTD purchased the Bernardo brand assets from TEFKAB in 2011. In addition to paying a lump sum at closing, NFTD agreed to pay specified "earn-out payments" to be calculated based on the brand's success under NFTD's ownership. The parties dispute whether or the extent to which the written asset-purchase agreement represents and warrants that the Bernardo patents were valid and enforceable, but the agreement does not disclose that the previous patent-enforcement litigation or the Maryland malpractice suit raised questions about the patents. Although NFTD

4

engaged lawyers to conduct due diligence into TEFKAB's intellectual property, Cooper and Miller assert that they never learned that the five patents were invalid. They also assert that if Howard had told them that there were problems with the patents, they would have ceased all negotiations, "would not have gone through with" the purchase, and "[t]here would have been no deal." After NFTD purchased the Bernardo brand assets from TEFKAB, it hired Howard to handle the process of registering the Bernardo patents.

Three years later, in 2014, Cooper and Miller decided to sell the Bernardo brand assets. At that time, however, NFTD still owed TEFKAB some earn-out payments under the 2011 purchase agreement, so Cooper and Miller approached TEFKAB about settling those liabilities to make it easier to sell the assets. Howard—who had since moved to a new law firm—represented TEFKAB in those negotiations. Ultimately, in 2015, the parties reached a settlement and NFTD released all claims it might have against TEFKAB or against Howard and his firm.

Meanwhile, in February 2014, NFTD sold the Bernardo brand assets to a company called JPT Group, LLC. As part of this transaction, NFTD signed an agreement expressly representing that all of the Bernardo patents were "valid and enforceable." Seven months later, JPT Group filed suit against a competitor for infringing on the Bernardo patents, only to conclude (as Trae and TEFKAB had concluded years earlier) that the patents were invalid. Although the record does not describe the outcome of JPT Group's patent-infringement suit, JPT Group sued NFTD for breaching their asset-purchase agreement and the warranties provided in that agreement.

In response to JPT Group's suit, NFTD asserted third-party claims against TEFKAB for breach of contract and warranties, fraudulent inducement, and intentional and negligent misrepresentations, alleging that TEFKAB knew that the patents were invalid when it sold the

5

assets to NFTD in 2011. NFTD then also added Howard and Haynes and Boone as third-party defendants,[7] alleging that they too knew that the patents were invalid and asserting claims for negligence, gross negligence, negligent misrepresentation, breach of fiduciary duty, fraud, and fraud in the inducement.[8] TEFKAB then filed cross-claims for legal malpractice against Howard and Haynes and Boone.[9]

Ultimately, JPT Group, NFTD, and TEFKAB arbitrated or otherwise settled and dismissed all of the claims between them. Howard and Haynes and Boone, however, still faced both legal-malpractice claims asserted by their former client, TEFKAB, and a variety of negligence, fraud, and misrepresentation claims asserted by NFTD, which they did not represent during the 2011 transaction. The trial court severed the legal-malpractice claims (all claims "arising out of the attorney-client relationship"), leaving only NFTD's claims against Howard and Haynes and Boone "not arising out of the attorney-client relationship."

Howard and Haynes and Boone then moved for summary judgment, arguing that the attorney-immunity defense applies and bars all of the remaining claims. Citing this Court's opinion in *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015), they argued that attorney immunity bars NFTD's claims because the claims are based on actions Howard and Haynes and Boone took within the scope of their representation of TEFKAB, in opposition to NFTD's interests. In

---

[7] NFTD also named Howard's new law firm, K&L Gates, as a third-party defendant, but the record is unclear about the resolution of those claims, and K&L Gates is not a party to this appeal.

[8] NFTD later added claims for fraud by nondisclosure, aiding and abetting fraud, and negligent omissions.

[9] An investor in NFTD, Jacqueline Miller, also intervened in the action, asserting claims against TEFKAB, Howard, and Haynes and Boone for fraud, negligent misrepresentation, and civil conspiracy. She "incorporate[d] and fully adopt[ed]" NFTD's brief in the court of appeals as well as NFTD's brief as respondent in this Court. We will refer to NFTD and Ms. Miller collectively as NFTD.

response, NFTD argued that attorney immunity does not apply because Howard's conduct did not occur within a litigation context, and even if it does apply in a non-litigation context, not all of Howard's wrongful conduct fell within his duties as TEFKAB's lawyer. The trial court granted summary judgment in favor of Howard and Haynes and Boone and dismissed all the claims against them.[10]

NFTD appealed. The court of appeals reversed the trial court's summary judgment, holding that attorney immunity does not "extend . . . beyond the litigation context" and "should not be extended to a business transaction." 591 S.W.3d 766, 773 (Tex. App.—Houston [14th Dist.] 2019). We granted Howard and Haynes and Boone's petition for review to address whether the attorney-immunity defense applies to a non-client's claims that are based on an attorney's conduct performed outside of the litigation context.[11]

## II.
### Jurisdiction

As always, we must first determine whether we have jurisdiction to decide this case. Although the parties do not raise this issue, we must consider it *sua sponte* when our jurisdiction seems in doubt. *State ex rel. Best v. Harper*, 562 S.W.3d 1, 7 (Tex. 2018). Here, our doubt arises from the fact that NFTD's claims depend on its assertion that the Bernardo brand patents are

---

[10] Shortly before the summary-judgment hearing, NFTD amended its petition to assert a new negligent-misrepresentation claim. After the trial court granted summary judgment, Howard and Haynes and Boone filed a plea to the jurisdiction, arguing that attorney immunity also bars NFTD's newly filed claim. The trial court agreed and granted the plea.

[11] The Court has received amicus curiae briefs from law firm Reid Collins & Tsai LLP and Professor Robert P. Schuwerk in support of NFTD and from attorney Richard G. Wilson and a consortium of fifty Texas law firms in support of Howard and Haynes and Boone.

invalid and unenforceable. If the patents are valid and enforceable, Howard's alleged misrepresentations were not misrepresentations at all.

Federal law provides: "No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents . . . ." 28 U.S.C. § 1338(a). A claim based on federal law—like the patent-infringement suit TEFKAB filed in the 2000s—clearly "arises under" federal patent law, but state-law claims may also arise under federal law under section 1338 and deprive Texas courts of jurisdiction. *See Gunn v. Minton*, 568 U.S. 251, 257–58 (2013). To fall within this "slim category" of state-law-based claims that "arise under" federal law, the claim must involve a federal-law issue that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* at 258.

In *Gunn*, the Supreme Court held that a legal-malpractice claim in which a client accused his lawyers of failing to raise an argument in an unsuccessful patent-infringement case did not arise under federal law, even though resolution of a federal issue (whether the argument would have prevailed to validate the patent) was "necessary" to the case and the parties actually disputed that issue. *Id.* at 259. Although the claim thus met the first two requirements, the Court concluded that the federal issue was not "substantial" because its resolution in the malpractice case was not important "to the federal system as a whole." *Id.* at 260. In reaching this conclusion, the Court reasoned that the federal issue regarding the patent's validity was merely "hypothetical," in that, regardless of whether the client prevailed on the malpractice claim, the patent would "remain invalid" under federal law, based on the federal court's judgment in the earlier patent-infringement suit. *Id.* at 261.

8

Under this reasoning, the Court concluded that "state legal malpractice claims based on underlying patent matters will rarely, if ever, arise under federal patent law for purposes of section 1338(a)" because "those cases are by their nature unlikely to have the sort of significance for the federal system necessary to establish jurisdiction." *Id.* at 258–59. And because states "have 'a special responsibility for maintaining standards'" governing attorneys and other "members of the licensed professions," the Court concluded that the "hypothetical" issue of the patent's validity did not satisfy the fourth requirement of being "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* at 264 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978)). The Court thus refused to conclude "that Congress—in establishing exclusive federal jurisdiction over patent cases—meant to bar from state courts state legal malpractice claims simply because they require resolution of a hypothetical patent issue." *Id.*

Here, as in *Gunn*, the question of whether the Bernardo patents are valid and enforceable is "necessary" to the resolution of NFTD's fraud and misrepresentation claims against Howard and Haynes and Boone. *See, e.g.*, *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019) (noting fraud claim requires showing that defendant "made a false, material representation"); *McCamish, Martin, Brown & Loeffler v. F.E. Appling Ints.*, 991 S.W.2d 787, 791 (Tex. 1999) (noting negligent-misrepresentation claim requires showing that defendant "supplie[d] false information") (quoting RESTATEMENT (SECOND) OF TORTS § 552(1) (Am. Law Inst. 1977)). And as in *Gunn*, Howard and Haynes and Boone actually dispute whether the Bernardo patents are in fact invalid and unenforceable. Although they do not vigorously contend in this Court that the patents are valid, they consistently avoid conceding that they are.

9

But unlike *Gunn*, we cannot determine from the record or the parties' briefing whether a federal court, or any other court, has actually found that the Bernardo patents are invalid and unenforceable. According to the record and briefs, TEFKAB voluntarily dismissed the patent-infringement suit it originally filed in federal court. TEFKAB asserted in the trial court that the jury in the legal-malpractice suit it filed in Maryland state court found that only one of the five Bernardo patents was invalid, while Howard and Haynes and Boone assert that TEFKAB did not recover damages in that suit and refer to it as "unsuccessful" litigation. And the record does not reflect the outcome of the patent-infringement suit JPT Group later filed in federal court, other than to reflect that JPT Group settled that suit after it "discovered" that the patents were invalid, leading it to file suit against NFTD. In short, the record does not reveal whether any federal court or federal administrative body has actually ruled on the Bernardo patents' validity.

In *Gunn*, the United States Supreme Court concluded that the issue of the validity of the patent in that case was not "substantial," in part because the federal courts had already determined that the patent was invalid and no resolution in the legal-malpractice case could undermine that determination. 568 U.S. at 261. But here, we cannot tell whether any federal court has actually ruled on the Bernardo patents' validity. Federal authorities, unfortunately, appear to be inconsistent on whether the issue of a patent's validity is "substantial" in a state-law case like this one, which depends on the resolution of that issue but offers no evidence that a federal court has yet made that determination. *See* Paul Gugliuzza, *Rising Confusion About "Arising Under" Jurisdiction in Patent Cases*, 69 EMORY L.J. 459, 485–86 (2019) (discussing federal cases and other patent-law authorities).

We conclude that, at least under these facts as presented to us, the issue of the Bernardo patents' validity is not sufficiently important "to the federal system as a whole" to make the issue "substantial" for purposes of federal jurisdiction under section 1338. *Gunn*, 568 U.S. at 260. The Supreme Court explained in *Gunn* that what makes an issue "substantial" is the federal government's "direct interest in the availability of a federal forum to vindicate its own administrative action." *Id.* at 260–61. And that interest is not implicated by a state-court case that cannot change the "real-world result" of whether a patent is or is not valid. *Id.* at 261. Should it ever become necessary, the question of whether the Bernardo patents are valid may be "decided by a federal court in the context of an actual patent case, with review in the Federal Circuit," and those courts will not be bound by any finding in this case. *Id.* at 262. The finding in this case will be "fact-bound and situation-specific," affecting only the parties here, and such "effects are not sufficient to establish federal arising under jurisdiction." *Id.* at 263.

We conclude that this case does not present the kind of "substantial" federal-law issue that supports exclusive federal jurisdiction under section 1338. As a result, Texas courts have jurisdiction over NFTD's claims against Howard and Haynes and Boone, and we thus have jurisdiction over this appeal.

### III.
### Attorney Immunity

We now turn to the issue Howard and Haynes and Boone present in their petition for review. Despite the complicated background and the jurisdictional issue, the substantive issue is straightforward: Does attorney immunity apply to actions a lawyer takes on behalf of a client outside of the litigation context? We hold that it does, so long as the lawyer's conduct constitutes the "kind" of conduct the attorney-immunity defense protects.

11

## A. The roots of the attorney-immunity defense

Attorney immunity is an affirmative defense that "stem[s] from the broad declaration over a century ago that 'attorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages.'" *Cantey Hanger*, 467 S.W.3d at 481 (quoting *Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex. App.—Dallas 1910, writ ref'd)). But the defense's roots actually go far deeper: like much of our common law, the recognition of attorney immunity began as a British import.

In 1861, the House of Lords held in *Robertson v. Fleming* that a group of sureties could not sue a debtor's solicitor for drafting a security agreement that failed to provide them proper security.[12] The court reasoned that the solicitor's duty arose only through privity of contract with his client and did not extend to an adverse party who did not share that privity.[13] Eighteen years later, the United States Supreme Court relied on *Robertson* in *Savings Bank v. Ward*, 100 U.S. 195 (1879). *Ward* arose when an attorney who was hired to examine title to a piece of real property wrote a report declaring his client's title good and the property unencumbered. *Id.* at 197. As it turns out, the attorney failed to discover that his client had actually sold the property through a duly recorded conveyance. *Id.* at 196. The client nevertheless took the attorney's report to a bank and secured a loan with a deed of trust to the property that he did not own. *Id.* at 197. When the client defaulted on the loan and the bank realized it could not sell the property, it sued the attorney.

---

[12] *See* Robert E. Mallen, 1 LEGAL MALPRACTICE § 7.5 (2021) [hereinafter Mallen] (citing and discussing *Robertson v. Fleming* (1861) 4 Macq. 167 (H.L. Sc.)).

[13] *Id.*

The Court held that the bank could not recover from the attorney because no privity of contract existed between them. *Id.* at 200. "[T]o restrain the remedy from being pushed to an impracticable extreme," the Court held that actionable negligence must be limited to situations in which a legal duty exists, whether "arising from contract or otherwise." *Id.* at 202 (quoting *Kahl v. Love*, 37 N.J.L. 5, 8 (Sup. Ct. 1874)). Quoting from *Robertson*, the Court stated, "He only who, by himself or another as his agent, employs the attorney to do the particular act in which the alleged neglect has taken place can sue him for that neglect, and that employment must be affirmed in the declaration of the suit in distinct terms." *Id.* Thus, "[t]he initial American rule became that, without fraud, collusion, or privity of contract, an attorney is not liable for injuries to others while representing a client." Mallen § 7:5.

Over the next century, the rule became "greatly liberalized, and the courts have permitted a plaintiff not in privity to recover damages in many situations for the negligent performance of a contract." *Biakanja v. Irving*, 320 P.2d 16, 18 (Cal. 1958) (allowing recovery against attorney for drafting a faulty will); *see Lucas v. Hamm*, 364 P.2d 685, 688 (Cal. 1961) ("It follows that the lack of privity between [non-client] plaintiffs and [attorney] defendant does not preclude plaintiffs from maintaining an action in tort against defendant."); *Ultramares Corp. v. Touche*, 174 N.E. 441, 445 (N.Y. 1931) ("The assault upon the citadel of privity is proceeding in these days apace.") (Cardozo, C.J.). In extending an attorney's potential liability beyond the privity requirement, courts generally relied on a third-party-beneficiary theory, or on the concept of foreseeability, or on the unreasonableness of the non-client's reliance on the attorney's conduct. *See, e.g., Pelham v. Griesheimer*, 440 N.E.2d 96, 99 (Ill. 1982) ("[T]he best approach is that the plaintiffs must allege and prove facts demonstrating that they are in the nature of third-party intended beneficiaries of

13

the relationship between the client and the attorney in order to recover in tort."); *Goodman v. Kennedy*, 556 P.2d 737, 739 (Cal. 1976) (holding that defendant attorney owed no duty to third parties who relied on faulty advice the attorney gave his clients "in the absence of any showing that the legal advice was foreseeably transmitted to or relied upon by plaintiffs or that plaintiffs were intended beneficiaries of a transaction to which the advice pertained"). But despite the attorney-immunity defense's relaxation in some courts, "no jurisdiction has found a duty of care based on negligent services by an attorney to an adverse party." Mallen § 7:8.[14]

## B. The attorney-immunity defense in Texas

This Court relied on the privity theory in our 1996 decision, *Barcelo v. Elliott*, 923 S.W.2d 575, 578–79 (Tex. 1996). In *Barcelo*, the Court held that the beneficiaries of a trust could not recover from an attorney who negligently drafted the trust agreement because the attorney had been hired by the settlor and owed no duty to the intended beneficiaries. *Id.* at 576. In adopting this rule, the Court reasoned that the threat of litigation from and liability to third parties would divide the attorney's loyalties. *Id.* at 578. "Without this 'privity barrier,'" we explained, "clients would lose control over the attorney-client relationship, and attorneys would be subject to almost unlimited liability." *Id.* at 577. To "ensure that attorneys may in all cases zealously represent their clients without the threat of suit from third parties compromising that representation," the Court established "a bright-line privity rule which denies a cause of action to all beneficiaries whom the attorney did not represent." *Id.* at 578–79.

---

[14] A more thorough history of the extension of potential liability beyond privity can be found in Donald B. Hilliker, *Attorney Liability to Third Parties: A Look to the Future*, 36 DEPAUL L. REV. 41, 55–58 (1986).

We blurred that bright line a bit, however, a few years later, in *McCamish*, 991 S.W.2d at 793. There, we held that in some circumstances, a non-client may bring a negligent-misrepresentation claim against an attorney. *Id.* at 791. We noted, "Other jurisdictions have indicated a willingness to subject lawyers to [such a] claim by a nonclient in connection with the preparation of different types of evaluations, given the proper circumstances," and we cited those "proper circumstances" as including drafting warranty deeds, title certificates, offering statements and memoranda, and annual reports—in other words, circumstances outside of the litigation context. *Id.* at 793.

We reasoned in *McCamish*, however, that permitting a non-client to bring a negligent-misrepresentation claim against an attorney would not "undermine" the privity requirement if that claim arose not from the "duty a professional owes his or her clients or others in privity, but on an independent duty to the nonclient based on the professional's manifest awareness of the nonclient's reliance on the misrepresentation and the professional's intention that the nonclient so rely." *Id.* at 791, 792. To determine whether the non-client could have justifiably relied on the attorney's representations, we explained, "one must consider the nature of the relationship" not just between the attorney and the non-client, but "between the attorney, client, and nonclient." *Id.* at 794. Generally, we explained, "a third party's reliance on an attorney's representation is not justified when the representation takes place in an adversarial context," including "business and commercial" contexts. *Id.* (quoting 1 Ronald E. Mallen and Jeffrey M. Smith, LEGAL MALPRACTICE, § 7.10 (4th ed. 1996)).

When it is difficult to determine whether the circumstances were adversarial or non-adversarial, we explained that "the characterization of the inter-party relationship should be

guided, at least in part, by 'the extent to which the interests of the client and the third party are consistent with each other.'" *Id.* (quoting Jay M. Feinman, *Attorney Liability to Nonclients*, 31 TORT & INS. L.J. 735, 750 (1996)). In other words, when the client and non-client shared the same interest, it is more likely that the non-client could have justifiably relied on the attorney's representations. But when the client and non-client had adverse interests and the attorney was acting in an adversarial context in the interests of the client, the non-client could not have justifiably relied on the attorney's representations and cannot recover from the attorney.

When the Court later decided *Cantey Hanger*, we made little mention of "privity." Instead, we focused on the kind of conduct that falls within the scope of attorney immunity. *See* 467 S.W.3d at 481–84. The plaintiff in *Cantey Hanger* alleged that the attorneys who represented her then-husband in a divorce proceeding had committed fraud by falsifying a bill of sale to shift tax liabilities from the sale of an airplane from her husband to her. *Id.* at 479–80. We held that attorney immunity barred the claim because "[e]ven conduct that is 'wrongful in the context of the underlying suit' is not actionable if it is 'part of the *discharge of the lawyer's duties in representing his or her client*.'" *Id.* at 481 (quoting *Toles v. Toles*, 113 S.W.3d 899, 910–11 (Tex. App.—Dallas 2003, no pet.)) (emphasis added). In support of this standard, we also cited another decision in which a court of appeals explained that an attorney "cannot be held liable to a third party for conduct that *requires the office, professional training, skill, and authority of an attorney*." *Id.* at 481–82 (emphasis added) (quoting *Dixon Fin. Servs., Ltd. v. Greenberg, Peden, Siegmyer & Oshman, P.C.*, No. 01-06-00696-CV, 2008 WL 746548, at *7 (Tex. App.—Houston [1st Dist.] Mar. 20, 2008, pet. denied) (mem. op. on reh'g)). Under this standard, "an attorney's conduct may be wrongful but still fall within the scope of client representation" and thus be protected by attorney

immunity. *Id.* at 485. Because the attorneys' alleged conduct in *Cantey Hanger* "was within the scope of its representation" of their client and "was *not foreign to the duties of an attorney*," we held that the attorneys were "protected by attorney immunity." *Id.* (emphasis added).

We noted in *Cantey Hanger* that a "consensus [existed] among the courts of appeals that, as a general rule, attorneys are immune from civil liability to non-clients 'for actions taken in connection with representing a client *in litigation*.'" *Id.* at 481 (emphasis added) (quoting *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)). But we also stated more broadly that "an attorney does not owe a professional duty of care to third parties who are damaged by the attorney's negligent representation of a client." *Id.* Because we concluded that the law firm's allegedly fraudulent conduct occurred "within the scope of its duties in representing its client in litigation," we expressly did not consider whether attorney immunity could apply "to an attorney's conduct that is unrelated to litigation but nevertheless falls within the ambit of client representation and 'requires the office, professional training, skill, and authority of an attorney.'" *Id.* at 482 n.6 (quoting *Dixon*, 2008 WL 746548, at *7). And although we observed that, within the litigation context, "other mechanisms are in place to discourage and remedy such conduct, such as sanctions, contempt, and attorney disciplinary proceedings," we specifically noted that courts of appeals "have applied attorney immunity (or indicated that it could apply) outside the litigation context." *Id.* at 482 & n.6.

We next addressed attorney immunity in *Youngkin v. Hines*, 546 S.W.3d 675 (Tex. 2018). We held in *Youngkin* that the attorney-immunity defense barred a non-client's claim that his opponents' attorney fraudulently entered into a settlement agreement knowing his clients did not intend to comply with the agreement and then prepared fraudulent deeds to deprive the non-client

of his property. *Id.* at 678–79. Relying on *Cantey Hanger*, we reaffirmed that whether attorney immunity applies depends on "the *kind* of conduct at issue rather than the *alleged wrongfulness* of said conduct." *Id.* at 681. Because the "defense exists to promote 'loyal, faithful, and aggressive representation' by attorneys, which it achieves, essentially, by removing the fear of personal liability," we confirmed that immunity applies when a non-client's claim is based on an attorney's conduct "within the *scope of his representation of his clients*," as opposed to conduct that is "outside the scope of his representation of his client" or "*foreign to the duties of a lawyer*." *Id.* at 681, 682 (emphases added) (citing *Cantey Hanger*, 467 S.W.3d at 481–82).

Our description of the defense in *Youngkin* made no reference to the litigation context. *See id.* at 682 (noting that *Cantey Hanger* "cited approvingly" to *Alpert*, a case denying claims based on "acts taken and communications made to facilitate the rendition of legal services," which included "filing lawsuits and pleadings, providing legal advice, and being aware of settlement negotiations" (quoting *Cantey Hanger*, 467 S.W.3d at 484)). As in *Cantey Hanger*, *Youngkin* involved only conduct within the litigation context, and we did not address whether attorney immunity applies to conduct beyond that context.

Last term, we addressed the issue again in *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 654 (Tex. 2020). The plaintiff in *Bethel* sued her opponent's attorney for fraud, trespass to chattel, and conversion, alleging that the attorney intentionally destroyed evidence that was key to her claims against the attorney's client. *Id.* She urged us to recognize an exception to the attorney-immunity defense by allowing a non-client's claims against her opponent's attorney when the attorney engages in "criminal conduct during the course of litigation." *Id.* at 657. We declined to recognize such an exception, just as we had previously

18

declined to recognize an exception for fraud claims, because it would "significantly undercut" the protections of attorney immunity. *Id.* Instead, we held that even "criminal conduct is not categorically excepted from the protections of attorney civil immunity when the conduct alleged is connected with representing a client in litigation." *Id.* Because the attorney's allegedly criminal conduct "involved *the provision of legal services*," we concluded that the conduct was protected by attorney immunity. *Id.* at 658 (emphasis added). But because *Bethel*, like *Cantey Hanger* and *Youngkin*, involved only litigation-related conduct, we did not address whether attorney immunity would apply outside of that context. *See id.* at 657–58.

## C.  The limits of attorney immunity

In each of these cases, and in another case we decide today, we confirmed that the attorney-immunity defense is not without its limits. In *Cantey Hanger*, for example, although we acknowledged that attorney immunity extends even "to an attorney's knowing participation in fraudulent activities *on his client's behalf*," we agreed that an attorney's "participation in '*independently* fraudulent activities' is considered 'foreign to the duties of an attorney' and is not shielded from liability." 467 S.W.3d at 483 (emphases added) (quoting *Alpert*, 178 S.W.3d at 406) (citing *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985, no writ)); *see Cunningham v. Tarski*, 365 S.W.3d 179, 192 (Tex. App.—Dallas 2012, pet. denied). We explained that although fraud is "not an exception" to attorney immunity, "the defense does not extend to fraudulent conduct that is outside the scope of an attorney's legal representation of his client, just as it does not extend to other wrongful conduct outside the scope of representation." *Cantey Hanger*, 467 S.W.3d at 484. When an attorney personally participates "in a fraudulent business scheme *with* his client," as opposed to on his client's behalf, the attorney

19

"will not be heard to deny his liability" because "such acts are entirely foreign to the duties of an attorney." *Id.* at 482 (quoting *Poole v. Hous. & T.C. Ry. Co.*, 58 Tex. 134, 137 (1882)).

In another decision issued today, we expound further on the attorney-immunity defense's limits. *See Landry's*, — S.W.3d —. The non-client in *Landry's* sued its opponent's attorneys for defamation, business disparagement, and other tortious conduct arising from the attorneys' conduct in issuing press releases repeating their client's allegations against the non-client and publishing those press releases and allegations on the internet and through social media. *Id.* at —. The attorneys asserted immunity, but we held that immunity did not apply because an "attorney who repeats his client's allegations to the media or the public for publicity purposes is not acting in the unique, lawyerly capacity to which Texas law affords the strong protection of immunity." *Id.* at —. Although the attorneys were acting on their client's behalf when they issued and posted their client's allegations, we confirmed that immunity applies only when the attorney's actions involve "the uniquely lawyerly capacity of one who possesses 'the office, professional training, skill, and authority of an attorney.'" *Id.* at — (quoting *Cantey Hanger*, 467 S.W.3d at 482). Because "[a]nyone—including press agents, spokespersons, or someone with no particular training or authority at all—can publicize a client's allegations to the media," we concluded that such publicity statements, "while sometimes made by lawyers, do not partake of 'the office, professional training, skill, and authority of an attorney.'" *Id.* at —. Attorney immunity, we explained, "does not apply to an activity simply because attorneys often engage in that activity," even if the activity would "further the representation." *Id.* In short, "attorney immunity will not protect a lawyer when his 'acts are entirely foreign to the duties of an attorney.'" *Id.* at — (quoting *Cantey Hanger*, 467 S.W.3d at 482). But as in our prior decisions, we did not address in *Landry's*

20

whether attorney immunity applies beyond the litigation context because the "allegedly defamatory public statements arose from anticipated litigation." *Id.* at — n.4.

Summarizing our jurisprudence, attorney immunity protects an attorney against a non-client's claim when the claim is based on conduct that (1) constitutes the provision of "legal" services involving the unique office, professional skill, training, and authority of an attorney *and* (2) the attorney engages in to fulfill the attorney's duties in representing the client within an adversarial context in which the client and the non-client do not share the same interests and therefore the non-client's reliance on the attorney's conduct is not justifiable. *See id.* at — (holding immunity did not apply because the conduct had "little to do with 'the office, professional training, skill, and authority of an attorney'" *and* was not "part of the discharge" of a "lawyer's duties in representing his or her client" (quoting *Cantey Hanger*, 467 S.W.3d at 481)); *see also Bethel*, 595 S.W.3d at 658; *Youngkin*, 546 S.W.3d at 681; *McCamish*, 991 S.W.2d at 794. Whether the defense applies depends on whether the claim is based on this "*kind*" of conduct, not on the nature of the conduct's alleged wrongfulness. *Bethel*, 595 S.W.3d at 657; *Youngkin*, 546 S.W.3d at 681.

## D. The non-litigation context

As we have explained, our prior decisions have discussed attorney immunity as applied to claims based on conduct within the litigation context and do not address whether the defense also applies to conduct outside of that context. Other courts, however, have tried to read the tea leaves, as they must. *See, e.g.*, *LJH, Ltd. v. Jaffe*, No. 4:15-CV-00639, 2017 WL 447572, at *3 (E.D. Tex. Feb. 2, 2017) (holding that "the attorney immunity doctrine is not limited to only litigation" because this Court "cited two cases 'as examples of cases in which courts have applied attorney immunity (or indicated that it could apply) outside the litigation context'" (quoting *Cantey Hanger*,

21

467 S.W.3d at 482 n.6)).[15] In *Troice v. Greenberg Traurig, L.L.P.*, 921 F.3d 501, 506 (5th Cir. 2019), the Fifth Circuit finally hazarded an *Erie* guess that "the Supreme Court of Texas would apply the attorney immunity doctrine in the non-litigation context." It noted a "trend among the Texas courts of appeals" toward viewing attorney immunity "in a comprehensive manner." *Id.* That "comprehensive view," it reasoned, "most likely" includes the "multitude of attorneys that routinely practice and advise clients in non-litigation matters." *Id.*

Today we confirm that attorney immunity applies to claims based on conduct outside the litigation context, so long as the conduct is the "kind" of conduct we have described above. We reach this conclusion because we see no meaningful distinction between the litigation context and the non-litigation context when it comes to the reasons we have recognized attorney immunity in the first place. We have recognized attorney immunity because attorneys are duty-bound to competently, diligently, and zealously represent their clients' interests while avoiding any conflicting obligations or duties to themselves or others. *See Cantey Hanger*, 467 S.W.3d at 488 (Green, J., dissenting); *Barcelo*, 923 S.W.2d at 578–79; *Bd. of Law Exam'rs v. Stevens*, 868 S.W.2d 773, 780 (Tex. 1994) (describing how Texas disciplinary rules require attorneys to zealously represent their clients); *see also* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.01 & cmt. 6, 1.06, 1.08, 2.02. Attorney immunity exists to promote such "loyal, faithful, and aggressive representation" by alleviating in the mind of the attorney any fear that he or she may be sued by

---

[15] *See also Dorrell v. Proskauer Rose LLP*, No. 3:16-CV-1152-N, 2017 WL 6764690, at *4 (N.D. Tex. Nov. 2, 2017) ("Although the Fifth Circuit has expressly declined to decide the issue, other federal courts interpreting Texas law on attorney immunity have consistently determined that attorney immunity may apply outside of formal litigation.") (citations omitted).

or held liable to a non-client for providing such zealous representation. *Youngkin*, 546 S.W.3d at 681 (citing *Cantey Hanger*, 467 S.W.3d at 481); *see also Barcelo*, 923 S.W.2d at 578.

An attorney's duty to provide such loyal representation does not arise only in a litigation context. Zealous representation must occur not just in litigation, but in "all professional functions" of an attorney. TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶ 3; *see* Mallen, § 7:1 ("The adversary relationship is not limited to litigation."). "An attorney's duty to represent a client zealously begins as soon as 'the client has requested the lawyer to render legal services and the lawyer has agreed to do so.'" *Hanna v. Niemann*, No. 03-98-00708-CV, 1999 WL 394894, at *3 (Tex. App.—Austin June 17, 1999, pet. denied) (not designated for publication) (quoting TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶ 12). Allowing a non-client to sue an attorney based on the "kind" of conduct the immunity defense protects would create as much of a risk of dividing an attorney's loyalties in a transactional context as it would in a litigation context.

We are aware, however, that the protections a non-client enjoys against an opponent's attorney's wrongful conduct in a non-litigation context are not as numerous as the protections available within a litigation context. As we have observed, the litigation context offers "other mechanisms," besides a suit against the attorney, to discourage and remedy an opposing attorney's wrongful conduct, "such as sanctions, contempt, and attorney disciplinary proceedings." *Cantey Hanger*, 467 S.W.3d at 482. Although the first two of these mechanisms are only available in the litigation context, the third is available to any non-client who complains of an attorney's wrongful conduct. And as occurred in this case, non-clients who are harmed by an attorney's wrongful conduct in representing the other party in a business transaction or other non-litigation context can usually sue the other party, who in turn can sue the attorney for indemnification for the damage

23

the attorney's wrongful conduct causes. We agree that these mechanisms provide sufficient incentive to discourage attorneys from engaging in wrongful conduct within the non-litigation context. We therefore hold that the attorney-immunity defense applies in all adversarial contexts in which an attorney must zealously and loyally represent his or her client, so long as the conduct constitutes the "kind" of conduct attorney immunity protects.

## E. Application

In this case, NFTD does not dispute that most of its claims are based on conduct in which Howard and Haynes and Boone engaged to represent their client, TEFKAB. And NFTD does not dispute that the negotiation and completion of the sale of the Bernardo brand assets from TEFKAB to NFTD constituted an adversarial context in which the two parties did not share the same interests. Howard and Haynes and Boone owed the duty of loyal and zealous representation in connection with that transaction exclusively to TEFKAB, and not to NFTD. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 51 cmt. c (Am. Law Inst. 2000) ("Similarly, a lawyer representing a client in an arm's-length business transaction does not owe a duty of care to opposing nonclients . . . ."). NFTD was represented by its own counsel, who owed that same duty to NFTD.

NFTD contends, however, that even if attorney immunity applies to claims based on conduct in the non-litigation context, at least some of Howard's allegedly fraudulent conduct was not the kind of legal services to which the defense applies. NFTD points out that TEFKAB hired Howard to represent it not just as a lawyer, but for "any and all business, financial and legal matters." Consistent with this broad engagement, NFTD asserts that Howard assisted TEFKAB

not just on legal matters, but also on financial matters and business decisions that he made on the company's behalf.

According to NFTD, for example, Howard participated in TEFKAB's decision to sell the Bernardo brand assets and then served as TEFKAB's "broker" in the transaction, in which role he prepared the Confidential Business Profile that misrepresented the assets' validity and value. These roles, NFTD contends, do not involve the unique office, training, skills, and authority of an attorney, but instead could have been performed by anyone having sufficient business or marketing skills. And in addition, NFTD contends, Howard was acting not in TEFKAB's interest, but only in his own interest when he met with and made misrepresentations to Cooper and Miller while trying to solicit NFTD to hire him as its attorney once the sale went through. NFTD argues that this conduct was "foreign to the duties" Howard owed to his client. At a minimum, NFTD contends, the evidence creates a fact issue on whether its claims are wholly based on the "kind" of conduct immunity protects, and that fact issue requires reversing the trial court's summary judgment. NFTD raised these arguments in both the trial court and the court of appeals, and again in its briefing in this Court.

Howard and Haynes and Boone dispute these assertions and arguments, contending that regardless of the "labels" NFTD places on their alleged conduct, all of the conduct occurred in connection with the negotiation and drafting of the asset-purchase agreement, which fell within the scope of their representation of TEFKAB.

Because the court of appeals concluded that attorney immunity does not apply in the non-litigation context, it did not reach these arguments. And both parties have made these arguments, both to the court of appeals and to this Court, without the benefit of today's decision in *Landry's*,

which provides crucial guidance regarding the limitations on the "kind" of conduct that attorney immunity protects. Under these circumstances, we conclude that we should remand this case to the court of appeals so that it can consider these issues it did not reach. *See Univ. of the Incarnate Word v. Redus*, 518 S.W.3d 905, 911 (Tex. 2017).

## IV.
## Conclusion

We confirm that attorney immunity provides a defense to a non-client's claims based on an attorney's conduct that (1) constitutes the provision of "legal" services involving the unique office, professional skill, training, and authority of an attorney *and* (2) the attorney engages in to fulfill the attorney's duties in representing the client within an adversarial context in which the client and the non-client do not share the same interests. And in light of the defense's purposes, we hold that it applies to claims based on conduct the attorney performed in a non-litigation context, so long as the conduct qualifies as this "kind" of conduct. We reverse the court of appeals' judgment holding that attorney immunity does not apply in the non-litigation context, and we remand the case to that court to consider whether the summary-judgment evidence conclusively established that the conduct at issue here qualifies as that "kind" of conduct.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: May 21, 2021